UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| BCD Technology Holdings, LLC et al., *Plaintiffs,* v. Paragon Micro, Inc. et al., *Defendants.* | No. 25 CV 6944 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

In early 2025, Defendants Eugene Kozlovitser, Darren Giacomini, Max Burgess, Santo Nudo, Erik Schmidt, and Tracey Lingle ("Employee-Defendants") left their positions at Plaintiff Burgess Computer Decisions ("BCD") and began employment at Defendant Paragon Micro, a company that sells similar products to BCD.[1] BCD and its parent company, Plaintiff BCD Technology Holdings, filed suit alleging that Defendants misappropriated trade secrets, breached contracts and fiduciary duties, tortiously interfered with contracts and prospective economic advantage, induced breaches of fiduciary duties, unfairly competed, and engaged in civil conspiracy. [Dkt. 35.][2] Defendants moved to dismiss, and Plaintiffs, for their part, sought a preliminary injunction to prevent future harm stemming from these violations. [Dkts. 36, 48.] The court grants Defendants' motion to dismiss in part and denies Plaintiffs' motion for a preliminary injunction.

I.    **Background**

A.    **Facts**

1.    **BCD**

Plaintiff BCD Technology Holdings is the parent company of BCD. BCD provides video surveillance and storage solutions for security integrators and Original Equipment Manufacturer partners in the physical security and enterprise video surveillance industry. [Dkt. 39, ¶ 2.] It conducts business worldwide and

---

[1]    Plaintiffs refer to themselves collectively as BCD. But because Burgess Computer Decisions and BCD Technology Holdings are two separate corporate entities, the court declines to do the same. For purposes of this order, when using "BCD," the court refers only to Burgess Computer Decisions.

[2]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

considers itself a leader in the industry, having completed more than 235,000 product installations in 97 countries. [*Id.*, ¶ 4.]

The company has invested millions of dollars in developing its Innovation Center, an onsite engineering lab which it uses to pre-test and validate servers and storage solutions. [*Id.*, ¶¶ 3, 5.] According to Plaintiffs, BCD's "customer information and specially developed processes make up BCD's 'secret sauce' that the company has long considered confidential and not to be shared with competitors." [Dkt. 123 at 7.][3] Plaintiffs describe the "secret sauce" as the "customer specific marriage of software and hardware." [Dkt. 63 at 16.]

BCD has also invested time and money in customer relationships by, for example, establishing a thorough understanding of each customer's needs, preferences, and contact information. [*Id.*, ¶ 5; Dkt. 64, ¶¶ 2–3.] And the company trains its employees to maintain and manage these positive customer relationships. [Dkt. 39, ¶ 5.] Part of maintaining those relationships requires employees to access confidential information, such as sales data and customer profiles. [Dkt. 113, Tr. (or Hearing Transcript) at 120–121.]

Employee-Defendants Eugene Kozlovitser, Darren Giacomini, Max Burgess, Santo Nudo, Erik Schmidt, and Tracey Lingle all worked for BCD in senior roles until early to mid-2025. While working for the company, each Employee-Defendant received an employee handbook that prohibited them from revealing confidential information, such as compensation data and customer account information, outside of their BCD job duties. [Dkt. 39-1 at 169; Tr. at 21, 123.] Compliance with the handbook was a condition of employment and all Employee-Defendants except Giacomini signed an acknowledgment of receipt and understanding of the handbook. [Dkt. 35, ¶ 30.] Employee-Defendants also signed confidentiality agreements, which similarly prevented their disclosure of BCD's confidential information. [Dkt. 39, ¶¶ 8, 9, 16, 20, 22, 24, 26.] Max, Nudo, and Lingle, moreover, signed noncompete agreements that barred them from conducting business with a competitor for one year following their termination of BCD employment. [*Id.*, ¶¶ 20, 22, 24.]

BCD also takes other measures to preserve confidentiality. Technology staff monitor access to BCD's servers and databases. [Dkt. 63-1 at 10.] BCD restricts access to databases depending on an employee's role and employees cannot access any databases without proper digital credentials. [Tr. at 21.] And employees must use unique passwords and multifactor authentication to access their company email accounts. [Tr. at 20.]

BCD allows employees to use their personal phones and laptops for work. [Dkt. 86 at 44; Tr. at 83–85; Dkt. 86-6 at 16, 21, 26, 36.] Consequently, BCD employees

---

[3] Throughout this order, the court often uses the terms "client," "customer," "integrator," and "partner" interchangeably. [See Dkt. 63 at 8 (BCD describing its "customers" as "primarily system integrators and channel partners").]

regularly save customer contact information on their personal devices and are not told to delete those contacts when they leave the company. [Dkt. 86 at 45; Tr. at 84, 103; 86-6 at 21, 26, 36.] BCD does not have a policy that prevents its employees from connecting with BCD customers on LinkedIn or requires them to delete those connections upon their departure from the company. [Tr. at 84–85.]

### 2. Paragon

Paragon is a value-added reseller and complete solutions provider. It sells computer hardware, software, and solutions to businesses and government agencies in the United States, Canada, and United Kingdom. [Dkt. 117, ¶ 1.] Before 2025, Paragon outsourced configuration work. [Tr. at 274.] In 2022, however, Paragon began its search for a technology-enabled facility so it could conduct configuration services. [Tr. at 276–78.] During its search, Paragon came across a building that BCD rented and used as its Innovation Center. [Tr. at 276–78.] The building was advertised as a turn-key technology distribution and configuration center. [*Id.* at 276.] Paragon purchased the building in 2025. [Tr. at 281.] Upon vacating, BCD left the building's wiring and cabling intact. [*Id.*]

Since 2024, Paragon has hired nine former-BCD employees, including each Employee-Defendant. [Tr. at 202.]

### 3. Eugene Kozlovitser

As Paragon was taking over the former BCD-building, BCD's then-CEO directed Paragon's CEO, Jeff Reimer, to speak with two BCD employees—Eugene Kozlovitser and Alex Burgess—if he had any questions about the facility. [*Id.* at 278–79.] While Paragon representatives were inspecting the building, Kozlovitser approached Reimer, and Paragon's General Manager, Tod Cowen, and asked if the company was hiring. [*Id.* at 280.]

Kozlovitser interviewed with Paragon in November 2024. [*Id.*] Intrigued by his ability to oversee configuration operations and manage the recently-purchased technology distribution and configuration center, Paragon created a position for Kozlovitser, "Director of Technology, Configurations & Facilities." [Tr. at 285; Dkt. 63-4 at 7–9.] It extended an employment offer to him in November 2024. [Dkt. 63-5 at 5.] Meanwhile, on December 3, Reimer sent Cowen a text about Kozlovitser's offer: "Let's lock him up verbally. Tell him to keep things quiet." [*Id.* at 10.] Kozlovitser accepted Paragon's job offer in December 2024. [Tr. at 267–68.]

Meanwhile, Kozlovitser told BCD that he would be leaving the company on January 23, 2025. [Tr. at 267.] That same day, he texted Reimer, "My loyalty is now to Paragon and only Paragon." [Tr. 269–70.] Kozlovitser did not resign until February 14, 2025, however. [*Id.* at 270.] And at that time, he entered into a consulting agreement with BCD, which he terminated a week later. [*Id.* at 270–71.] Kozlovitser began at Paragon on February 17, 2025. [Dkt. 113 at 209.]

3

Cowen and Kozlovitser exchanged emails discussing his departure from BCD. On December 17, Cowen emailed Kozlovitser, "We do not want you to mention anything to the current leadership there about your decision prior to the closing of the building—too many things can get sideways if we throw this on to the table. This is an important point." [Dkt. 63-7 at 2.] Kozlovitser replied: "My plan is not to mention anything to them about any personal decisions or me thinking about making a move or leaving. I want to understand what they are planning for the future, and if there is any new news to the recent meetings they had with a few potential buyers." [*Id.* at 3.]

Between his Paragon interview and his last day under contract with BCD, Kozlovitser continued to communicate with Cowen and Reimer. This included sharing confidential information regarding the potential sale and purchase price of BCD; advising on Paragon's development of a "Systems Readiness Center" designed to replicate BCD's Innovation Center; attending a meeting with one of Paragon's OEM partners on Paragon's behalf; and providing a list of BCD employees responsible for generating approximately $75 million in revenue for BCD. [Dkt. 63-5 at 11; Dkt. 85-1 at 84, 87; Tr. at 210–215, 223–27, 294–98.] And shortly after his departure from BCD, Kozlovitser deleted "a good amount" of recent BCD emails and wiped his laptop. [Dkt. 65 at 10–12, 31; Tr. at 96.] Kozlovitser, furthermore, was a part of a conversation where Cowen discussed their "raiding plan for BCD." [Dkt. 69-1 at 5.]

Once at Paragon, Kozlovitser reached out via phone, email, or LinkedIn to at least thirteen BCD customers "to see what [Paragon] could offer them." [Tr. at 263–67; Dkt. 133-9 at 2–3.] When emailing with one customer, Kozlovitser mentioned that he had a "rough understanding" of the terms of the customer's agreement with BCD. [Dkt. 85-2 at 157.]

While at Paragon, Kozlovitser had a goal to "[s]ell deep, custom solutions to the target audience that BCD served before." [Dkt. 67-3 at 32.][4] In a presentation to more than 200 Paragon employees, Kozlovitser shared examples of BCD configuration services he provided at BCD and talked about price margins for installing hard drives, a service he performed as a BCD employee. [Dkt. 85 at 62.]

In April 2025, BCD sent letters to Kozlovitser and Paragon, demanding that they "cease and desist from improperly interfering with BCD's business, including

---

[4] Plaintiffs also assert that Kozlovitser shared his knowledge of BCD's pricing. But the evidence they offer, an email exchange where another Paragon employee, Chase Sonen, lists BCD pricing, is not convincing. Kozlovitser submitted an affidavit explaining that he did not take customer pricing information when he left BCD. [Dkt. 86-6 at 17.] The email where Sonen references BCD's pricing, he explains, was created after a BCD customer sent Kozlovitser a BCD quote—a practice that seems commonplace in this industry. [*Id.*; Tr. at 171 (Basgall testifying that BCD receives other company's quotes from clients); Dkt. 86-6 at 14 (Kozlovitser attesting to the same); Dkt. 70-3 at 2 (customer sending Paragon a BCD quote); Dkt. 65-4 (customer sending Paragon a quote from BCD and Genetec).]

[their] intentional interference with BCD's employees and customer relationships." [Dkt. 65 at 19.]

### 4. Darren Giacomini

Darren Giacomini worked as BCD's Director of Advance Systems Architecture. [Dkt. 86-6 at 20.]

At the time he began working for BCD, Giacomini already had several longstanding client relationships, including Rick Verbsky of Video Security Specialists, Jim Allenson of Covalent Technologies, and Dave Nutsch of Electric Company of Omaha, which he brought with him to BCD. [Dkt. 86-6 at 59, 64; Dkt. 87-6 at 125.] These companies then followed Giacomini to Paragon on their own volition because they trusted his expertise. [Dkt. 87-6 at 127 (Nutsch stating, "Once I learned that Darren was no longer employed by BCD, there was no reason to continue ordering technology and materials for its customers through BCD."); Dkt. 86-6 at 66 (Allenson stating, "Covalent made the decision to switch to ordering technology for its customers' needs through Paragon because of Covalent's long-standing relationship and trust in Darren, and not for any other reason."); *id.* at 61 (Verbsky explaining that VSS's customers "wished to follow Darren to Paragon Micro, Inc. and order their technology solutions through Paragon Micro, Inc.").][5]

In early 2025, Giacomini reached out to Kozlovitser via text to discuss opportunities at Paragon. [Tr. at 286–87; Dkt. 85-6 at 17.] At Giacomini's request, Kozlovitser then set up a meeting between Paragon and Giacomini, which ultimately led to an employment offer, which Giacomini accepted. [Dkt. 85-6 at 17, 19.]

Once Giacomini resigned, BCD requested to review his personal laptop, which he used for work while at BCD. [Tr. at 139.] Plaintiffs believe it contains confidential information, including "as-built product information, customer diagrams, and any support-related tools." [*Id.*] Giacomini informed BCD that he would only offer his laptop for review if he was dropped from this lawsuit. [*Id.* at 44.]

### 5. Santo Nudo

Nudo worked for BCD as an Inside Channel Manager. [Dkt. 86-6 at 25.] He applied to Paragon in April 2025 after reviewing the company's career page on LinkedIn. [Dkt. 86-6 at 26.] After completing an interview process, Paragon offered

---

[5] During the evidentiary hearing, BCD's Vice President of Sales, Joshua Basgall, testified that VSS refused to use BCD after Giacomini's departure because Giacomini refused to provide the relevant as-builts and told VSS that BCD had no one capable of providing the services VSS needed. [Tr. at 148–49.] The court finds that Verbsky's declaration demonstrates that VSS would have followed Giacomini regardless. [Dkt. 86-6 at 60–61.] The declaration also provides that VSS is willing to accept BCD bids as soon as BCD employs someone with the same credentials as Giacomini. [*Id.*]

him the position of Account Manager, which he accepted. [*Id.*] While at Paragon, Nudo has emailed with two customers of BCD. [Dkt. 66-1.] When requesting a quote from Paragon, one of those customers sent Nudo a 2022 quote from BCD. [*Id.*, at 4.]

While at BCD, Nudo made a habit of documenting his sales, including customer and revenue information, on an Excel file. [Tr. at 143.] His supervisor, Joshua Basgall, does not believe Nudo returned the Excel file "when asked to turn in his stuff." [Tr. at 143.] But according to Nudo, upon his resignation, BCD did not provide instructions "regarding confidential information, data preservation, or any non-compete obligations." [Dkt. 86-6 at 26.] And he says BCD never asked him to surrender or provide access to any personal devices he used for work. [*Id.*] Nudo also represents that he did not take any customer pricing information or other proprietary data with him when he left BCD. [*Id.*]

### 6. Max Burgess

Max worked for BCD in various sales positions. [Dkt. 35, ¶ 43.] But he began job hunting in mid-2024 and applied to Paragon in April 2025 after Cowen and Kozlovitser reached out to him about opportunities. [Dkt. 84-3 at 53.]

Once at Paragon, Max began emailing numerous BCD customers from his Paragon email account, informing them of his new position and offering a link to Paragon's complete product line. [Dkt. 65-4.] During his deposition, Max testified that he obtained the email and phone numbers of many BCD customers through his Paragon Apollo account, a paid third-party service used to research existing or potential customers. [Dkt. 84-3 at 30–31, 91–92; Tr. at 186–89.][6] Specifically, he browsed his LinkedIn account for connections at various companies and then used Apollo to pin down the connection's contact information. [*Id.*] Max admitted that many of the customers he reached out to using this method had originally connected with him on LinkedIn while he was employed at BCD. [*Id.*] At one point, Max texted Kozlovitser stating that he was "calling literally everyone in [his] phone because" he wanted to "burn BCD to the ground." [Dkt. 69-5 at 5.]

In his role at Paragon, Max also created a Sales Activation Plan. [Dkt. 67-1.] The Plan shared information, including annual revenue, key contacts, buying habits, and top partners, concerning a client he serviced at BCD. [*Id.* at 4.] In an email with Reimer and Cowen, Max shared key information about another BCD customer. [Dkt. 84-5 at 15.] Max told Reimer and Cowen he wanted to provide "some background information" concerning the customer ahead of a call with several of the customer's executives. [*Id.*] That information included, among other things, identifying which executive makes the technical decisions, explaining "important characteristics [the

---

[6] According to Cowen, Apollo allows a user to input a company name and receive information, including names, titles, emails, and phone numbers, of people who work at the company. [Tr. at 188.]

customer] looks for in a partner," and listing the amount of money the customer spent at BCD the previous year. [*Id.*]

Max's self-stated goal for his first year at Paragon was to sell $1–1.25 million in profit to sixteen specific customers—at least fourteen of those customers were customers of BCD. [Dkt. 84-4 at 204; 84-3 at 71.]

### 7. Tracey Lingle

Lingle worked for BCD as a Strategic Accounts Solutions Specialist. [Dkt. 35, ¶ 67.] Having explored opportunities with various companies, Lingle applied to Paragon in July 2025 after reviewing postings on LinkedIn and speaking with Kozlovitser. [Dkt. 86-6 at 35.] Once at Paragon, Lingle connected with and received messages on LinkedIn from decision makers at companies BCD serviced. [Tr. at 113; Dkt. 41 at 21–42.][7] And several BCD customers called Lingle's personal cell phone when they did not receive responses from his BCD email address. [Dkt. 86-6 at 36.]

During his time at BCD, Lingle would have gained knowledge of customer configurations and preferences. [*Id.* at 112.][8]

### 8. Erik Schmidt

Schmidt worked for BCD as a National Accounts Manager. [Dkt. 35, ¶ 59.] He worked with "specific customers to design year-long pricing and price books" and gained knowledge regarding customer needs and preferences. [Tr. at 42.]

Believing Paragon would present opportunities he did not have at BCD, Schmidt applied to Paragon July 2025 through its website and LinkedIn page. [Dkt. 86-6 at 30.] While at Paragon, Max cc'd Schmidt on an email to a customer he had worked with at BCD. [Dkt. 65-4 at 71.] Schmidt replied, providing the customer his contact information and stating, "I'm committed to delivering the same trusted services and products you've relied on me and this team for in the past, but now with an expanded portfolio to address RFPs and project requirements you had to find other sources to procure." [*Id.*]

---

[7] Plaintiffs submitted an exhibit containing screenshots of LinkedIn notifications sent to Lingle's BCD email. [Dkt. 41 at 21–42.] These notifications, for the most part, do not include the content of the LinkedIn message, so it would be speculation for the court to decide one way or the other whether Lingle reached out to the BCD customers or whether the customers instead reached out to him. Many of the emails, moreover, simply notify Lingle that a particular person accepted his connection request.

[8] At the evidentiary hearing, O'Mahoney testified that Lingle kept a notebook where he documented "a lot of configuration information." [Tr. at 112.] O'Mahoney asserted that Lingle would also know customer configurations and purchasing preferences "off the top of his head." [*Id.*] But Plaintiffs did not present evidence that Lingle kept the notebook or took any other documents from BCD upon his departure.

### 9. Damages

According to BCD's chief operating officer, Daniel O'Mahoney, if Paragon continues to sell products to BCD customers, BCD's survival as a company is at risk. [Dkt. 63-1 at 26; Tr. at 63.] At his deposition, Max stated that he believes he's sold around $275,000 worth of Paragon products to customers who also bought from BCD. [Dkt. 84-3 at 36.] Kozlovitser testified at his deposition that Paragon's configuration services have generated about $800–$900,000 in revenue from customers that have also bought from BCD. [Dkt. 85 at 83.] Cowen estimated during his deposition that former BCD employees have generated about $1 million in revenue for Paragon, and he explained that the exact figures broken down by customer would be accessible on their "ERP CRM system and [] Power BI reporting." [Dkt. 84-6 at 57.] Reimer represented at his deposition that Paragon would not slow down in its effort to continue expanding its business, including its new configuration services. [Dkt. 63-4 at 13.]

### B. Procedural History

Plaintiffs filed their complaint in June 2025. [Dkt. 1.] Defendants filed a motion to dismiss in August. [Dkt. 20.] In response, Plaintiffs filed an amended complaint, and Defendants again sought dismissal. [Dkts. 35, 48.] And two days after filing their amended complaint, Plaintiffs filed a motion for a preliminary injunction. [Dkt. 36.] Once the parties fully briefed the motion to dismiss and motion for preliminary injunction, the court held an evidentiary hearing. [Dkt. 110.] At the hearing, the court heard testimony from O'Mahoney, Basgall, Cowen, Kozlovitser, and Reimer. [Tr. at 113.] The parties then filed supplemental briefs, along with proposed findings of fact and conclusions of law. [Dkts. 117, 120, 123, 124.]

## II. Analysis

### A. Motion to Dismiss

Defendants move to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). The court "accept[s] all well-pleaded facts as true and draw[s] all reasonable inferences in plaintiff's favor." *Id.* at 600 (citing *Tamayo v. Blagojevich*, 526 F.3d

8

1074, 1081 (7th Cir. 2008)).[9] The court assesses the complaint's plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

### 1. Standing

Defendants assert that BCD Technology Holdings lacks standing to bring claims stemming from the employment contracts and employment relationship between Burgess Computer Decisions and Employee-Defendants. [Dkt. 49 at 7.]

It is well established that a plaintiff "must assert his own legal rights" and, in general, "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). A parent company and its subsidiaries are separate corporate entities. See *Old Orchard Urb. Ltd. Partnership v. Harry Rosen, Inc.*, 904 N.E.2d 1050, 1061 (Ill. App. Ct. 2009) ("Illinois regards a parent corporation as a separate legal entity from a wholly owned subsidiary, even where the two entities have mutual dealings."). And a "corporation does not have independent standing to sue for injuries done to a sister or subsidiary corporation, despite the fact that their business are intertwined and the success of one is dependent on that of the other." *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F. Supp. 2d 805, 814 (N.D. Ill. 2009) (citing 1 Fletcher Cyclopedia of the Law of Private Corporations § 36 (rev. ed. 2006) and *Hudson Optical Corp. v. Cabot Safety Corp.*, 162 F.3d 1148 (2d Cir. 1998)); see *Fed. Ins. Co. v. Parello*, 767 F. Supp. 157, 160 (N.D. Ill. 1991).

From the very beginning of their complaint and throughout this litigation, Plaintiffs refer to themselves collectively as "BCD." [Dkt. 35 at 1.] And despite ample opportunities to do so, Plaintiffs never differentiate between injuries suffered by BCD Technology Holdings and Burgess Computer Decisions. [Dkt. 90 at 29 (citing complaint, which only refers to Plaintiffs collectively); Dkt. 100 (incorporating argument made in docket 90); Dkt. 124 (same).] That framing makes it difficult to assess each plaintiff's role and alleged injury.

But as best the court can tell, BCD Technology Holdings only has standing to assert claims for misappropriation of trade secrets. According to the complaint, BCD Technology Holdings is a holding company of Burgess Computer Decisions. [Dkt. 35, ¶ 12.] It "owns, controls, and manages the assets" of Burgess Computer Decisions "but does not conduct day-to-day business operations." [*Id.*] Burgess Computer Decisions, on the other hand, is a subsidiary of BCD Technology Holdings that conducts business globally with its principal place of business in Illinois. [*Id.*, ¶ 13.] Burgess Computer Decisions, not BCD Technology Holdings, employed Employee-

---

[9] The Background section of this order relays facts revealed by discovery and makes factual findings under a preliminary injunction standard. But for purposes of analyzing Defendants' motion to dismiss, the court considers the facts as alleged in Plaintiffs' Amended Complaint, dkt. 35.

Defendants. [*Id.*] And it was Burgess Computer Decisions that entered into contracts with Employee-Defendants. [Dkt. 35-1 at 7, 45, 48, 51, 55, 57, 61, 63, 66, 70, 72.]

At bottom, the employment and contractual relationships are between Burgess Computer Decisions and each Employee-Defendant; BCD Technology Holdings does not have standing to sue for breach of fiduciary duty or contract based solely on its status as Burgess Computer Decisions' parent company, nor does it have standing on account of its interconnectedness with the success of Burgess Computer Decisions. See *Del Monte Fresh Produce*, 616 F. Supp. 2d at 814.

The court therefore dismisses BCD Technology Holdings' claims for breach of contract and fiduciary duty. And, as explained below, the Plaintiffs' claims for unfair competition, tortious interference with prospective economic advantage, civil conspiracy, and inducement of breach of fiduciary duty, to the extent they are not preempted, are grounded in Kozlovitser's breach of fiduciary duties. So BCD Technology Holdings also lacks standing to bring each of those claims. The only claims BCD Technology Holdings may proceed on, then, are those for trade secrets misappropriation under the DTSA and ITSA.

### 2. Misappropriation of Trade Secrets

"Courts often analyze motions to dismiss DTSA and ITSA claims together because 'the pertinent definitions of the two acts overlap.'" *Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4192072, at *9 (N.D. Ill. Sept. 15, 2021) (quoting *Inmar, Inc. v. Vargas*, 2018 WL 6716701, at *4 (N.D. Ill. Dec. 21, 2018)). "To prevail on a DTSA misappropriation claim, a plaintiff must show that (1) their information was a trade secret; (2) it was misappropriated; and (3) it was used in the defendant's business." *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1096 (7th Cir. 2026). Allegedly misappropriated information constitutes a trade secret if the owner implemented "reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839.

The first element, the existence of trade secrets, is met. Plaintiffs can plead this element "in broad strokes, as opposed to the more targeted showing required for injunctive relief." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020). Plaintiffs allege that information concerning its Innovation Center, supplier and vendor pricing, employees, client data, terms of service, technical data, and other non-public information constitute trade secrets. They also assert that this information was confidential and the company protected it through security measures, like confidentiality agreements. That level of specificity is enough at this stage of proceedings.

10

Plaintiffs have also adequately pleaded misappropriation and use in Defendants' business. The DTSA defines "misappropriation" as either the "acquisition of a trade secret of another ... by improper means" or the "disclosure or use of a trade secret of another without express or implied consent..." 18 U.S.C. § 1839(5)(A)–(B).

In addition to actual misappropriation, a plaintiff can proceed under an inevitable disclosure theory "by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). Courts consider three factors when determining whether disclosure of trade secrets is inevitable: "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp.2d 700, 734 (N.D. Ill. 2011).

Direct evidence of trade secret misappropriation is rare. Consequently, plaintiffs "can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence." *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001). An employee's "suspicious downloading of company information before his departure" or other efforts to "cover his tracks," for example, may allow an inference of misappropriation, at least at the pleading stage. *Lumenate Techs., LP v. Integrated Data Storage*, 2013 WL 5974731, at *5 (N.D. Ill. Nov. 11, 2013).

Here, while the complaint contains little, if any, direct evidence of misappropriation, it does allege several suspicious circumstances concerning each Defendant's departure. First, each Employee-Defendant resigned from BCD and then almost immediately took similar positions with Paragon, allegedly allowing Paragon to enter the market as a competitor to BCD. Kozlovitser falsely told BCD that he was not going to a competitor, "covertly" forwarded a "key sales contact" from his BCD email to his personal email address, and shared information about BCD's Innovation Center and employee salaries with Paragon. Giacomini refused to allow BCD to inspect the laptop he used for work, which allegedly contains numerous BCD trade secrets and confidential information. Lingle reached out on LinkedIn to several BCD customers he had worked with while at BCD. And Max solicited long-term BCD clients that Paragon had no prior relationship with. [*See generally* Dkt. 35, ¶¶ 33-36, 50, 74, 84-86.] BCD also alleges that one of its former customers told the company it was moving its business to Paragon "because of the information now possessed by Paragon Micro through BCD's former employees." [*Id.*, ¶ 81.]

As for Schmidt and Nudo, Plaintiffs' allegations of misappropriation in their complaint are sparse and conclusory. Plaintiffs adduced additional facts at the preliminary injunction hearing, however. Plaintiffs presented evidence that Nudo

11

and Schmidt, shortly after leaving BCD for Paragon, contacted customers who did business with BCD. Given the interplay between the arguments raised by the motion to dismiss and the request for preliminary injunctive relief, which includes additional evidentiary submissions, the court accepts these facts because they are consistent with allegations in the complaint. See *Croner*, 419 F. Supp. 3d at 1067 ("[A] plaintiff may supplement its argument in opposition to a motion to dismiss with unpleaded facts that are consistent with the allegations of the complaint … [such that] a plaintiff may rely on facts adduced at a preliminary injunction hearing when responding to a contemporaneous motion to dismiss.")[10]

These actions are enough to plausibly allege misappropriation by Defendants. Because, in addition to the actions above, each Defendant took a similar role with a direct competitor, Plaintiffs have also adequately pleaded threatened misappropriation under an inevitable disclosure theory. See *Lumenate Techs., LP*, 2013 WL 5974731, at *6. (explaining that evidence that a person assumed a similar position at a competitor combined with allegations of specific opportunity to misappropriate is enough to state a claim for inevitable disclosure); *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001) (company assigning employee-defendant to work on the same project they worked on at plaintiff-company supports an inference of actual or threatened misappropriation).

### 3. Breach of Contract

To state a claim for breach of contract, a plaintiff must allege facts demonstrating "(1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by defendant, and (4) resultant injury to the plaintiff." *Zahdan v. Frontline Bus. Enter. Inc.*, N.E.3d 1040, 1049–50 (Ill. App. Ct. 2024). Three contracts are at issue here: Kozlovitser's consulting agreement, the confidentiality agreements, and the noncompete agreements.[11]

### i. Confidentiality Agreements and Kozlovitser's Consulting Agreement

The confidentiality agreement and Kozlovitser's consulting agreement prohibit disclosure of confidential information. As explained above, the court finds that each Employee-Defendant had access to trade secrets and confidential information and resigned under circumstances raising an inference that they used or

---

[10] The court presumes that Plaintiffs would include appropriate facts developed in connection with the preliminary injunction proceedings into any amended complaint.

[11] Plaintiffs sometimes assert that the employee handbook is a contract. It is not. The employee handbook explicitly disclaims any intention to create a legally binding contract. [Dkt. 35-1 at 7.] See *Ivory v. Specialized Assistance Services*, 850 N.E.2d 230, 232–33 (Ill. App. Ct. 2006) (noting that where an employee handbook contains a disclaimer indicating that the handbook promises nothing and does not act as a contract, no enforceable contractual rights will be conferred on the employee based on that handbook).

might use that information at Paragon. The "inevitable disclosure" doctrine, moreover, applies to breach of contract. *PepsiCo, Inc.*, 54 F.3d at 1272. So for the same reasons BCD plausibly alleged a trade secret claim, they too allege breaches of the contracts protecting confidential information. See *CZS Holdings LLC v. Kolbe*, 2021 WL 1837385, at *4 (N.D. Ill. May 7, 2021) (finding that employer stated claim for breach of nondisclosure agreement by alleging that employee "had access to [employer's] trade secrets and other confidential information and that he used and disclosed that information in the creation and operation of a competing business").

### ii.     Noncompete Agreements

Defendants argue that BCD's noncompete agreements are unenforceable. The court agrees.

Under Illinois law, a restrictive covenant is enforceable if the restraint is reasonable and supported by adequate consideration. See *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011); see also *Medix Staffing Sols., Inc. v. Dumrauf*, 2018 WL 1859039, at *2 (N.D. Ill. Apr. 17, 2018) ("Under Illinois law, covenants not to compete are disfavored and held to a high standard."). A restraint is reasonable, the Illinois Supreme Court has explained, only if it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee[,] (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Id*. Under this totality of the circumstances test, courts consider, among other things, the length, territorial scope, and practical scope of the restrictions. *Id*. at 403.

The noncompete agreements here restrict competition for a period of one year following an employee's termination. As BCD points out, Illinois courts have generally found restrictive covenants of one year to be reasonable. See *Health Pros., Ltd. v. Johnson*, 791 N.E.2d 1179, 1193 (Ill. App. Ct. 2003).

BCD's noncompetes contain no geographical limitation, however. The lack of a geographic limitation is not *per se* unreasonable, especially considering BCD's claim that it conducts business globally. [Dkt. 35, ¶ 13.]; see *LKQ Corp. v. Rutledge*, 96 F.4th 977, 982 (7th Cir. 2024) ("Large radiuses might be justified by evidence that the entire area aligns with the employer's competitive market."). But see *Del Monte Fresh Produce*, 616 F. Supp. 2d at 817 (holding that lack of geographical scope rendered noncompete agreement unenforceable even though company did business globally). But even if BCD conducts business in every country in the world (the complaint alleges 91 countries), salespersons at BCD service specific geographical areas. [Dkt. 35, ¶ 44.] *Lawter Int'l, Inc. v. Carroll*, 451 N.E.2d 1338, 1345 (Ill. App. Ct. 1983) (explaining that lack of geographical scope may be determinative "where territorial restrictions as to salesmen or routemen are greater than the area that was served by these employees on behalf of the former employer").

13

In any event, BCD's noncompete agreements run into another problem. The agreements prohibit Defendants from working for "a business substantially similar to *or* competitive with the present business of [BCD] *or* such other business activity in which [BCD] may substantially engage during the term of employment." [Dkt. 35-1 (emphasis added).] As the Seventh Circuit has recently emphasized, "Illinois law disfavors 'blanket bar[s] on all activities for competitors.'" *LKQ Corp.*, 96 F.4th at 982 (quoting *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 526 (Ill. App. Ct. 2007)). Instead, "[r]estrictions on activities should be narrowly tailored to protect only against activities that threaten the employer's interest." *Cambridge Eng'g, Inc*, 879 N.E.2d at 526.

BCD's noncompete agreement is not narrowly tailored to address actual competitive concerns. Quite the opposite: just like the employee in *LKQ*, the Employee-Defendants here "could switch occupations, working for [Paragon] in a noncompetitive capacity without harm to [BCD's] interests, and still violate the provision." *LKQ Corp.*, 96 F.4th at 982. The industry BCD operates within underscores this point. BCD's business model is niche—it specializes in one specific area, video surveillance and storage services for security integrator and OEM channels. [Dkt. 35, ¶ 14.] Paragon, on the other hand, is full service; it provides video surveillance solutions along with hardware and software products and services. [*Id.*, ¶ 14.] So like the Seventh Circuit in *LKQ*, this court has "little difficulty concluding that '[s]uch blatant overbreadth goes far beyond the standard for acceptable activity restrictions.'" *Id.* (quoting *Cambridge Eng'g*, 879 N.E.2d at 526). It is patently unreasonable.

BCD, for its part, doesn't respond to Defendants' assertion that its blanket activity restriction is unreasonable, focusing only on the geographical scope. [Dkt. 90 at 27–28.] It points to no case where a court found a noncompete that prohibited a former employee from working for a substantially similar business *in any capacity* to be reasonable. No surprise, countless cases come out the other way. See, *e.g.*, *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 718 (N.D. Ill. 2014) (finding unreasonable, at the motion to dismiss stage, a restrictive covenant barring employee from "engag[ing] in any business substantially related to the business of [employer] within United States and Canada"); *Medix Staffing Sols., Inc. v. Dumrauf*, 2018 WL 1859039, at *3 (N.D. Ill. Apr. 17, 2018) (finding similar noncompete agreement unenforceable at motion to dismiss stage); *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1148 (Ill. App. Ct. 1999) ("Therefore, where an activity restraint, such as a covenant not to solicit, lacks *both* a geographic limitation and any qualifying language concerning the particular customers to which it applies, it is unreasonable.").

Because the agreements use such broad and inclusive language, the court declines to "'blue pencil' the provision to comport with the law." *LKQ Corp.*, 96 F.4th at 983. The noncompete agreements are unenforceable, so claims based on their alleged breach are dismissed.

### 4.    Tortious Interference with Contract

To state a claim for tortious interference with contract, BCD must plead facts showing "(1) the existence of a contract; (2) the defendants' awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005).

BCD alleges that Defendants tortiously interfered with each of the Employee-Defendant's "Employment Agreements," including "at-will contracts" and "explicit non-compete agreements." [Dkt. 35, ¶¶ 114–15.] More specifically, it avers that Defendants "intentionally and unjustifiably interfered with BCD employee relationships by inducing BCD employees to terminate their Employment Agreements," "take employment with Paragon Micro, and compete with BCD in violation of those agreements." [*Id.*, ¶¶ 115–16.] According to BCD, Kozlovitser, using confidential information gathered during his time at BCD, identified BCD employees that Paragon then hired. [*Id.*, ¶¶ 78, 80.] And despite BCD sending Kozlovitser and Paragon a cease and desist letter requesting that they stop misappropriating BCD's confidential information, BCD explains, the Defendants continued to solicit more BCD employees. [*Id.*, ¶ 80.] BCD asserts that all Defendants were aware of the Employee Agreements at the time of their tortious interference.

As an initial matter, it's unclear which contracts BCD alleges Defendants interfered with. The complaint refers to "valid and enforceable employment agreements with each of the Employee Defendants" and goes on to say that the agreements include "at-will contracts" and "non-compete agreements." [Dkt. 35, ¶¶ 114–15.][12] Notably, the claim makes no mention of the confidentiality agreements or Kozlovitser's consulting agreement. That said, the court has an obligation to draw inferences in BCD's favor, so it will also examine whether the complaint states a claim for tortious interference with those contracts.

Beginning with the at-will employment contracts: Defendants assert that, under Seventh Circuit case law, a plaintiff cannot bring a tortious interference of contract claim when a defendant induces a plaintiff's employee to cancel an at-will employment contract. See *Cody*, 409 F.3d at 859 ("Under Illinois law, [a] defendant's inducement of the cancellation of an at-will contract constitutes at most interference with a prospective economic advantage, not interference with contractual relations.") (internal citations omitted). This makes sense. An employee does not "breach" an at-will employment contract by resigning from the at-will employment. *Id.*

BCD points to *Maximum Independent Brokerage, LLC v. Smith* for the opposite proposition. 218 F. Supp. 3d 630 (N.D. Ill. 2016). But *Smith* does not support their argument. In that case, the court held that "[a] plaintiff can plead tortious

---

[12]    Because the court found that the noncompete agreements are invalid, their claim for interference with those contracts are dismissed.

15

interference of an at-will contract *when the contract contains a valid non-compete provision.*" *Id.* at 640 (emphasis added). Critical to the holding, then, was that the at-will contract included a noncompete provision. *Id.* The employee did not merely "cancel" his at-will contract, he "breached" the noncompete provision of that contract. *Id.* It was that breach that allowed for the interference of contract claim to proceed. *Id.* Here, however, BCD presents no evidence that any Employee-Defendant *breached* the alleged at-will employment contracts. Instead, the alleged breaches concerned confidentiality agreements and noncompetes that existed separately from any at-will employment contract.

That leaves the confidentiality agreements. Drawing inferences in its favor, BCD has adequately alleged that each Defendant knew employees at BCD had confidentiality agreements. Each Employee-Defendant had a confidentiality agreement, which was also referenced in the employee handbook that every employee received. And BCD's allegations about Paragon's vetting process and the cease and desist letter are enough to infer knowledge that the Employee-Defendants were subject to contractual confidentiality obligations.

But while the Defendants may have had knowledge of the confidentiality agreements, the court sees no allegations raising an inference that any Employee-Defendant *induced* another to violate their confidentiality obligations. The complaint repeatedly asserts that each defendant misappropriated confidential information. It does not suggest, however, that they encouraged others to do the same. Alleging that a defendant passively allowed a breach is not enough. Nor is asserting that a defendant knows his "conduct is substantially certain to result in one party breaking its contract with another." *R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 687 (7th Cir. 1987). To state a claim for tortious interference of contract, a plaintiff must allege facts demonstrating that the defendant played an active role in bringing about the breach. See *Webb v. Frawley*, 906 F.3d 569, 579 (7th Cir. 2018). BCD does not do so.

With that, the court dismisses BCD's tortious interference with contract claims.

### 5.    Preemption

Defendants contend that Plaintiffs' remaining common law claims are preempted by the ITSA. The ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). Common law claims (other than contractual remedies) that "rest on conduct that is said to misappropriate trade secrets," then, are preempted by the ITSA. *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005). And, as the Seventh Circuit and Illinois courts have explained, a plaintiff cannot plead in the alternative to avoid preemption, meaning the "preemptive language in the ITSA [covers] claims that are essentially trade secret

16

misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014).

### i. Breach of Fiduciary Duty and Inducement of Breach of Fiduciary Duty

Defendants aver that BCD's breach of fiduciary duty and inducement of said breach claims are preempted and, if not preempted, fail to state a claim.

"To prevail on a claim for breach of fiduciary duty, it must be alleged and ultimately proved (1) that a fiduciary duty exists, (2) that the fiduciary duty was breached, and (3) that such breach proximately caused the injury of which the party complains." *Indeck Energy Servs., Inc. v. DePodesta*, 183 N.E.3d 746, 759 (Ill. 2021).

BCD's allegations on breach of fiduciary duty are slim. [See dkt. 35, ¶ 137 ("By taking BCD's confidential information and using the information for the benefit of a competitor, the Defendant Employees breached their fiduciary duties and caused harm to BCD.").] Looking only at this statement, the claim would appear preempted.

But viewing the complaint as a whole, BCD also asserts that Kozlovitser began competition while still employed with BCD when, unbeknownst to BCD, he began concurrent employment with Paragon. That action does not rely on misappropriation of trade secrets and constitutes a breach of Kozlovitser's fiduciary duties to BCD. See *Jano Just. Sys., Inc. v. Woodson*, 2009 WL 3010844, at \*3 (C.D. Ill. Sept. 16, 2009) ("An employee has a duty of loyalty to his current employer, during the term of his employment, that precludes him from working for the benefit of a competitor."); *Miller v. Harris*, 985 N.E.2d 671, 679 (Ill. App. Ct. 2013) ("An agent must not place himself in a position which is adverse to that of his principal during the existence of the agency.").

The complaint does not, however, state breach of fiduciary duty claims against the other Employee-Defendants. Unless a valid restrictive covenant applies, an employee's fiduciary duty generally ends upon termination of his employment. See *Sabre Indus., Inc. Waller Waller v. Sabre Indus.*, 2021 WL 6129000, at \*21 (C.D. Ill. Aug. 13, 2021). BCD alleges each Employee-Defendant resigned from BCD and then almost immediately began employment with Paragon where they used BCD's confidential information to solicit BCD employees and customers. The complaint is devoid of any allegations that these defendants other than Kozlovitser engaged in any misconduct prior to their resignation.

BCD's inducement of breach of fiduciary duty claim against Paragon, as it relates to Kozlovitser's actions pre-resignation, may proceed because the complaint raises a plausible inference that Paragon knew Kozlovitser was still working for BCD when he began employment with Paragon, and Paragon solicited and hired him anyway. See *Maximum Indep. Brokerage, LLC*, 218 F. Supp. 3d at 640 (inferring that a defendant-employer gained knowledge of a defendant-employee's contractual

17

obligations with their current employer through the defendant-employer's pre-employment discussions with defendant-employee).

### ii. Tortious Interference with Prospective Economic Advantage

"To succeed in an action for tortious interference with prospective economic advantage under Illinois law, the plaintiff must prove: (1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages." *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007). "There is no question that a corporation may generally compete for the at-will employees of a rival." *XPO Logistics, Inc. v. Gallatin*, 2013 WL 3835358, at *6 (N.D. Ill. July 24, 2013) (quoting *Dames & Moore v. Baxter & Woodman, Inc.*, 21 F.Supp.2d 817, 826 (N.D. Ill. 1998)). But a corporation cannot use wrongful means to do so. *Id.*

Plaintiffs allege that Paragon purposely interfered with its business relationships by "systematically pilfer[ing] BCD's key personnel" and encouraging them to "misappropriate BCD's confidential and proprietary customer information," dkt. 35, ¶ 124, which they allege constitute trade secrets, ¶¶ 99–100. The Employee-Defendants interfered, Plaintiffs explain, by "intentionally and methodically" leaving BCD and taking the "confidential and proprietary customer information for the purpose of soliciting BCD's customers away from BCD and to Paragon Micro to establish it as a competitor." [*Id.*, ¶ 124.]

"A plaintiff will generally not have a cause of action for interference with a prospective business relationship against a bona fide competitor, as is the parties' dynamic here, unless the circumstances indicate unfair competition or the use of wrongful means." *Holbrook Mfg LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 338 (N.D. Ill. 2020). In other words, it is most often a perfectly acceptable business practice to solicit employees and customers from competitors. See *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, 2023 WL 5334638, at *35 (N.D. Ill. Aug. 18, 2023) ("A competitor swooping in to recruit an employee or spoil the sale is not enough."). That's the very nature of competition. With that principle in mind, the alleged unfair competition or wrongful conduct concerns violations of the noncompetes, which the court found unenforceable, and misappropriation of trade secrets.[13] Since Plaintiffs'

---

[13]     Plaintiffs cite *XPO Logistics, Inc. v. Best Dedicated Solutions, LLC* for the proposition that the solicitation of BCD's employees and customers is itself a wrong independent of any trade secret misappropriation. 2017 WL 4150779. But in that case the wrong wasn't the solicitation on its own; it was the employee's violation of a non-solicit provision and the role the defendant played in inducing a breach of that provision. *Id.* at *3 ("As such, this portion of XPO's claim remains because it rests on XPO's allegations that BDS solicited XPO's employees and induced them to breach their post-employment non-solicitation of customer

tortious interference with prospective economic advantage claims thus "rest on conduct that is said to be misappropriate trade secrets," they are preempted and dismissed. *Hecny Transp., Inc.*, 430 F.3d at 404.

To the extent that Plaintiffs' tortious interference with prospective economic advantage claim is based on Kozlovitser's breach of fiduciary duty and Paragon's role in inducing that breach, however, the claim may proceed.

### iii. Unfair Competition

Plaintiffs assert that Defendants engaged in unfair competition by "targeting and hiring [] BCD employees en masse and then placing those employees in substantially similar roles to compete against BCD and [] targeting and hiring [] BCD employees in violation of their non-compete agreements." [Dkt. 39, ¶ 112.] This claim is largely preempted for the same reason as the Plaintiffs' tortious interference with prospective economic advantage claim. The noncompetes are invalid so it was not wrongful for Paragon to solicit and hire BCD employees, and the other unfair action concerns misappropriation of trade secrets.

Still, the unfair competition claim may proceed to the extent that it's premised on Kozlovitser's breach of fiduciary duty and Paragon's role in inducing that breach.

### iv. Civil Conspiracy

In support of their civil conspiracy claim, Plaintiffs allege that Defendants "knowingly and willfully conspire[d] and agree[d] among themselves to: (a) breach the Non-compete Agreements; (b) induce employees of BCD to terminate their employment with BCD and retain them for Paragon Micro and (c) [] solicit BCD customers and induce them to terminate their relationships with BCD and retain them as customers of Paragon Micro." [*Id.*, ¶ 128.] Once again, this claim is, for the most part, preempted because it is not wrongful to solicit the employees or customers of a competitor so long as no valid noncompete exists, and the only remaining wrongful acts concern the misappropriation of trade secrets.[14] To the extent

---

agreements."). The court did, in fact, rule that the portion of the claim which rested on misappropriation of trade secrets was preempted. *Id.* ("To the extent the claim involves misappropriation and disclosure of XPO's confidential information, that part of the claim is preempted.").

[14] Plaintiffs again direct the court to *XPO Logistics*. This time, Plaintiffs blatantly misstate the holding of the case by asserting *XPO* held that an employer's civil conspiracy claim was not preempted by the ITSA because the claim "'involve[d] allegations that [the defendant corporation] conspired with [former XPO employees] to breach the non-competition provisions,' non-solicitation provisions, and confidentiality provisions of the former XPO employees' agreements." [Dkt. 90 at 17 (citing *XPO Logistics*, 2017 WL 4150779, at *3.)] That's not accurate. The court in *XPO* made clear that the civil conspiracy claims could

Plaintiffs' civil conspiracy claim arose from Kozlovitser's breach of fiduciary duty, it fails because the complaint contains no non-conclusory allegations of agreement.

*    *    *

In the final analysis, the court denies Defendants' motion to dismiss Plaintiffs' (1) misappropriation of trade secrets claims against all Defendants, (2) claims for Employee-Defendants' breach of their confidentiality agreements (as to BCD), (3) breach of fiduciary duty claim against Kozlovitser (as to BCD), (4) inducement of Kozlovitser's breach of fiduciary duty claim against Paragon (as to BCD), and (5) claims for tortious interference with prospective economic advantage and unfair competition to the extent they are premised on Kozlovitser's breach of fiduciary duties and Paragon's role in inducing that breach (as to BCD). The remaining claims are dismissed.

## B.    Preliminary Injunction

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). As such, one is "never awarded as of right." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Rather, a plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter*, 555 U.S. at 20); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) ("The party seeking a preliminary injunction bears the burden of showing that it is warranted.").

### 1.    Likelihood of Success

To obtain a preliminary injunction, a plaintiff must demonstrate "some likelihood of success on the merits." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020). Demonstrating "a better than negligible chance" or "a mere possibility of success" is insufficient. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (cleaned up). This prong serves as "an early measurement of the quality of the underlying lawsuit." *Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).

---

proceed *only* on the theories concerning the non-competition and non-solicitation agreements. *Id*. *XPO* explicitly rejected a civil conspiracy based on violations of a confidentiality agreement. *Id.* (As with the unfair competition claim, to the extent the claim relies on the breach of the Individual Defendants' confidentiality provisions and misappropriation of XPO's trade secrets [] ITSA preempts those parts of the claim.").

### i. Claims Based on Kozlovitser's Breach of Fiduciary Duty

BCD makes no attempt to present evidence or argument demonstrating that Kozlovitser's breach of fiduciary duty—working for both BCD and Paragon for a week—caused independent damages.[15] BCD's damages are instead based on the Defendants' misappropriation of trade secrets in an effort to solicit BCD's employees and customers. [Dkt. 123 at 21 (claiming that "[w]hile still employed at BCD, Kozlovitser began relaying BCD's trade secrets and confidential information to Cowen" and solicited BCD employees "based on misappropriated salary information.")] Because any damages stemming from BCD's breach of fiduciary duty claim against Kozlovitser thus rests on conduct said to be misappropriation of trade secrets, it is likely preempted and therefore unlikely to succeed on the merits. And because BCD's inducement of breach of fiduciary duty, tortious interference with prospective economic advantage, and unfair competition claims all rest on Kozlovitser's breach of fiduciary duty, BCD is unlikely to succeed on those claims, too.

### ii. DTSA and ITSA

Recall from above that both a DTSA and an ITSA claim requires the plaintiff to show that (1) it has trade secrets, (2) the defendants misappropriated those trade secrets, and (3) the trade secrets were used in defendant's business. *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1096 (7th Cir. 2026).

Existence of Trade Secrets

After the motion to dismiss stage, it is no longer sufficient for Plaintiffs to describe their trade secrets in broad strokes. To the contrary, time and again, the Seventh Circuit has explained that plaintiffs must describe trade secrets with a "high level of specificity," *REXA, Inc. v. Chester*, 42 F.4th 652, 663 (7th Cir. 2022), as "concrete secrets," not "broad areas of technology," *NEXT Payment Sols., Inc.*, 163 F.4th at 1096 (quoting *REXA*, 42 F.th at 662)).

The court groups the Plaintiffs alleged trade secrets into three categories.[16] First, customer identities, to include the names and contact information of BCD

---

[15] Plaintiffs do not mention breach of fiduciary duty, inducement of fiduciary duty, tortious interference with prospective economic advantage, or civil conspiracy at all in its proposed findings of fact and conclusions of law. [Dkt. 123.]

[16] At times, Plaintiffs also assert that information about BCD's employee salaries and the revenue generated by its employees is a trade secret and confidential. The court finds that this information is not a trade secret. Plaintiffs do not explain what measures BCD enforced to protect that information, nor do they explain why that information has value in its secrecy. Salary and employee revenue information is also not included in BCD's confidentiality agreements.

customers, clients, and partners. Second, customer data and pricing information, which encompasses more specific information about customers and their preferences.[17] Third, "tools and processes," including "lab methodologies" and BCD's "secret sauce." [Dkt. 123 at 10.]

*Tools and Processes.* Start with the last category: tools and processes—what Plaintiffs refer to as the "secret sauce." This category lacks the specificity required to warrant trade secret protection. Despite multiple rounds of briefing and an evidentiary hearing, the court is unsure what exactly makes up BCD's self-described "secret sauce."

Consider the evidence offered by Plaintiffs. James Gross, the CEO of BCD during the time of Employee-Defendants' employment, described the "secret sauce" as "those unique kind of processes that we would do that would allow us to win this business over our competition." [Dkt. 71-3 at 8.] Jeff Burgess, the Founder and former CEO of BCD, described it as "secret sauce that we developed ourselves," "whatever we were developing [in the Innovation Center]. Most of it was based upon…whatever surveillance software is being used for the project." [Dkt. 66-5 at 6–7.]

Joshua Basgall, BCD's Vice President of Sales, was a little more specific in his description, stating that BCD's confidential information includes how it derives its storage requirements through its internal calculator. [Dkt. 86-4 at 18.] He went on to say, however, that he does not know how the calculator was developed or whether it used an open-source code. [*Id.*] Indeed, he stated he had no knowledge at all of the internal processes used in the Innovation Center and does not know whether Paragon uses a similar internal calculator to prepare its quotes. [*Id.* at 18–19.]

Finally, Daniel O'Mahoney, BCD's chief operating officer, in perhaps the most helpful explanation, described the "secret sauce" as the marriage of various inputs onto actual physical hardware. [Tr. at 93.] The inputs, he explained, include

---

[17]   Because it finds that some customer information is more valuable and less readily ascertainable than other information, the court differentiates between customer identities/contact information and more detailed customer data, such as preferences and tailored pricing or product information. For one, Plaintiffs have not provided much evidence on how BCD stores customer information. There appears to be no actual "list" of customers and their contacts. As best the court can discern, BCD keeps customer information in an online database, NetSuite. [Tr. at 20–21.] NetSuite contains far more information than just customers and customer data; it also contains information about marketing, outreach, trade shows, etc. [Tr. at 19.] Plaintiffs do not present evidence that any Defendant downloaded or suspiciously accessed records on NetSuite before leaving for Paragon. Plaintiffs do, on the other hand, present evidence that employees regularly kept customer identities and contact information on their personal devices. [Tr. at 84 (O'Mahoney testifying that employees regularly store customer contact information on personal cellphones and does not require employees to delete that information upon resignation).]

22

information such as the number of cameras, the relevant software, and the length of video. [*Id.*]

After piecing together the evidence, the court gathers that the processes and tools Plaintiffs claim to be proprietary consist of the methods it uses to combine customer preferences with the hardware those customers need for their video surveillance systems. [Dkt. 63 at 16 (claiming that "BCD's highly refined processes and procedures that it has developed over the years, including its individualized and customer specific 'marriage of software to the hardware,' and ongoing back-end support" make up the "secret sauce").] But Plaintiffs describe no algorithm, source-code, or other specific process unknown to the trade. [*Id.* (citing testimony of O'Mahoney, Jeff Burgess, and Gross).] Surely the customer inputs are not unknown to the trade; the customers themselves provide the necessary specifications. As it stands, then, there's no way to separate the allegedly proprietary information from "other information that goes into any software [or hardware] package." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002).

Suffice it to say that in describing its "secret sauce," Plaintiffs do exactly what the Seventh Circuit says not to do: "presents complex or detailed descriptions of methods and processes but fails to isolate the aspects that are unknown to the trade." *REXA*, 42 F.4th at 663; see *NEXT Payment Sols., Inc.*, 163 F.4th at 1096 (rejecting trade secret claim when company did not "identify any specific algorithms, source code, or methodologies underlying the [tool's] functionality" and instead defined "its modules in vague and generic language that describe[d] the software's function").

*Customer Contact Information.* Plaintiffs assert that the identity and contact information of its customers, clients, and partners are trade secrets. Defendants disagree, arguing that the information is not a trade secret because it is readily ascertainable through regular competitive means. Defendants' view prevails.

Whether customers and their contact information constitute a trade secret turns on the facts of the case. "Illinois courts" in particular, "have used demanding language to describe the threshold showing needed for customer lists to qualify as sufficiently secret, sometimes requiring that plaintiffs show they have developed the information over a number of years, at great expense, and kept the information under lock and key." *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 839–40 (C.D. Ill. 2014) (internal citations omitted). "[T]he ease with which information can be readily duplicated without involving considerable time, effort, or expense" also comes into play. *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 215 (Ill. App. Ct. 1995). Ultimately, where customer information is "readily available to competitors through normal competitive means," such as in a public directory or the internet, "no protectable interest exists." *Off. Mates 5, N. Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1085 (Ill. App. Ct. 1992).

In industries where it is relatively easy to ascertain the class of people in need of the relevant service or good, for instance, customer identity is less likely to be deemed a trade secret. See *Archer Daniels Midland Co. v. Sinele*, 139 N.E.3d 1036, 1045 (Ill. App. Ct. 2019); *Fleetwood Packaging v. Hein*, 2014 WL 7146439, at *4 (N.D. Ill. Dec. 15, 2014) ("But a vendor's customer list is not 'sufficiently secret' when those customer identities are readily available in a public directory, and the vendor provides a service commonly utilized by a particular class of potential customers."); *Sys. Dev. Servs., Inc. v. Haarmann*, 907 N.E.2d 63, 75 (Ill. App. Ct. 2009) (finding that a computer network services company's customer list was not a trade secret because "[i]n today's modern world, computers and computer networks are common business tools, and all businesses are potential customers of computer network services").

The court finds that the identities and contact information of BCD's customers are readily ascertainable and therefore not a protectable trade secret. For starters, Plaintiffs do not have much to say about how difficult it is to identify customers in the industry and learn their contact information. See *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 782 (Ill. App. Ct. 2002) (denying trade secret protection for customer information when, among other things, employer did not demonstrate the "time, effort, or expense in gathering [the] information"); *Packaging v. Hein*, 2015 WL 6164957, at *3 (N.D. Ill. Oct. 20, 2015) ("It is similarly the plaintiff's job to demonstrate that it took considerable effort, time, and resources to build its customer list.").

To be sure, Plaintiffs did present testimony that it spent years developing customer relationships and building a database that contained customer preferences. But this sheds little light on the pool of potential customers and the secrecy of their contact information.

Perhaps the customers for video surveillance services routinely attend the trade shows referenced in the record. [Tr. at 19; see *Fleetwood Packaging*, 2014 WL 7146439, at *4 (customer list not trade secret when "their identities are generally known throughout the industry and are in any event readily ascertainable through trade publications, industry reference guides, trade show participation, and other publicly available information").] And considering BCD's representation that very few companies offer similar video surveillance services, it's possible that the customers quickly become aware of new offerings and initiate contact themselves. [See Tr. at 52 (O'Mahoney stating that the industry is a "pretty small niche market where a lot of people know the same people")]; see also *Packaging*, 2015 WL 6164957, at *4 ("In a niche industry that [plaintiff] describes as highly competitive, [plaintiff] provides [no] factual allegations rendering it plausible that the limited universe of potential customers could somehow be secret as between the firms competing for the exact same business."). Or maybe, in the same way BCD did for years before this lawsuit, players in the industry display various partners on their websites as a

marketing tactic. [Dkt. 83-1 at 287–313 (BCD's website listing various BCD partners, including many that Plaintiffs accuse Defendants of soliciting); Tr. at 25.]

The record supports as much. Several emails show customers sharing quotes from one or more companies to garner the best price. [Tr. at 171 (Basgall testifying that BCD receives other company's quotes from clients); Dkt. 86-6 at 14 (Kozlovitser attesting to the same); Dkt. 70-3 at 2 (customer sending Paragon a BCD quote); Dkt. 65-4 (customer sending Paragon a quote from BCD and Genetec)]; see *Fleetwood Packaging*, 2014 WL 7146439, at *4 (customer identities not trade secret when "various customers in the industry send out requests for bids to many [suppliers]"). Employee-Defendants, moreover, offer evidence that some customers they worked with at BCD initiated contact and requested a quote from Paragon. [Dkt. 86-6 at 36.]

Plaintiffs also don't allege that they created a running list of customers kept under lock and key that Defendants copied, disclosed, or took with them when they left. Instead, Employee-Defendants, for the most part, either had names and contacts of customer representatives they worked with stored on their personal devices or had connections with those people on LinkedIn. BCD explicitly allowed its employees to use personal devices and LinkedIn for work and did not monitor their use or require employees to delete those contacts upon resignation. See *DM Trans, LLC v. Scott*, 2021 WL 4963606, at *9 (N.D. Ill. Oct. 26, 2021) (denying trade secret protection for customer information, in part, because employer allowed employees to store information on personal devices and did not inspect those devices upon separation with the employer). True, BCD required employees to sign confidentiality agreements covering "non-public, confidential or proprietary information" about customers and clients. [Dkt. 35-1 at 59, ¶ 1.] But it's not clear that agreement includes client identities and contact information, particularly since Jeff Burgess, BCD's former CEO and current majority owner, stated that BCD did not consider the identity of the customer's contact people to be confidential. [Dkt. 84-1 at 12–13.]

Employee-Defendants also did some reverse engineering based on memory. Max, for example, stated that he deleted all BCD related contacts from his phone when he left but then used LinkedIn and Apollo to reconstruct that contact information. And while Plaintiffs assert that Defendants are at an advantage by already knowing the identity of the "key decisionmakers," some of the emails sent to BCD customers by Employee-Defendants show otherwise. Dkt. 65-4 at 131–32 (the customer representative Max contacted in summer 2025 refers Max to a different customer representative); *id.* at 21 (same); *id.* at 15 (Max emailing large group of customers' employees); *id.* at 27 (same).

Twenty years ago, the effort required to identify and locate potential customers and contact information for video surveillance services may have been much higher. But in today's world where competition is increasingly growing, company affiliations and job titles are proudly displayed on networking websites like LinkedIn, and customers send out requests for quotes simultaneously to dozens of companies, a

25

finding that such information constitutes a trade secret would be akin to "forc[ing] a departing employee to perform a prefrontal lobotomy on himself or herself" and would "disserve the free market goal of maximizing available resources to foster competition." *Fleming Sales Co. v. Bailey*, 611 F. Supp. 507, 514 (N.D. Ill. 1985).

As a final observation: the court's conclusion that customer identity and contact information in these circumstances do not constitute trade secrets does not create a precedent where employees can leave for a competitor, taking all customer relationships with them. It only reinforces the need for a reasonable nonsolicitation or noncompetition agreement where both parties are free to negotiate the terms. See *Sinele*, 139 N.E.3d at 1046 (explaining that restrictive covenants, not trade secret law, are the proper mechanism for preventing former employees from soliciting their former employer's customers); *Fleming Sales Co.*, 611 F. Supp. at 515 (finding that customer list and preferences were not trade secrets and explaining that "it would really be unfair competition to allow the employer *without* such a covenant to obtain trade secret status for the fruits of ordinary experience in the business, thus compelling former employees to reinvent the wheel as the price for entering the competitive market"); *PrimePay, LLC v. Barnes*, 2015 WL 2405702, at \*25 (E.D. Mich. May 20, 2015) ("To read the [Michigan trade secret statute] as preventing an employee who has been made privy to particular customer information in the course of his employment from ever using that knowledge when working for (or in this case becoming) a competitor would impose a *de facto* covenant not to compete to which the employee had never agreed.").

*Customer Data and Pricing.* Finally, Plaintiffs urge the court to find that customer data and pricing information, some of which the company has gathered through long-standing relationships, constitutes a trade secret. On this, the court agrees. See *Orthofix Inc. v. Gordon*, 2016 WL 1170896, at \*9 (C.D. Ill. Mar. 24, 2016) ("While a mere list of customers, where that information is easy to acquire or well-known within a particular industry, is usually not sufficiently secret to warrant trade secret protection, pricing formulas and the business history and data used to generate them generally are."); *The Agency, Inc. v. Grove*, 839 N.E.2d 606, 616 (Ill. App. Ct. 2005) (noting difference between a list containing customer identities and general contact information and one containing more in-depth client information, such as preferences and business cycles).

As far as the court can tell, Plaintiffs haven't introduced any examples of the information NetSuite displays about its customers.[18] But the record suggests that the database includes information like a BCD partner's spending, projects, configurations, hardware preferences, etc. [Tr. at 28–29.] Courts have routinely held

---

[18]     A finding at the preliminary injunction stage is not a decision on the merits. While the court concludes Plaintiffs have done enough to show some likelihood of success on the merits, it also recognizes that, as the record develops, Defendants may be able to show that the information BCD gathered in NetSuite is easily ascertainable or lacks value.

that this sort of information can constitute trade secrets when not easily ascertainable. See, *e.g.*, *The Agency, Inc.*, 839 N.E.2d at 615. But see *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 793, 772 N.E.2d 768, 782 (Ill. App. Ct. 2002) (holding that employee's knowledge about customer preferences gathered through his time working for the customer constitutes general skills and knowledge, not a trade secret); *Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 986 (C.D. Ill. 2003) ("Illinois case law provides that a distributor has no proprietary interest in information belonging to the customer, such as the customer's own purchase history, needs and preferences.").

Plaintiffs presented testimony about how BCD gathers customer-specific information by developing relationships and working with the customers over the course of years. O'Mahoney, for example, testified at the evidentiary hearing that a customer's preferences could not be discerned by a 30-minute phone call. [Tr. at 18.] Rather, BCD develops an understanding of that information by working closely with its partners over time. [*Id.*] Plaintiffs also pointed to evidence suggesting that BCD took reasonable measures to maintain the secrecy of information in NetSuite and that the information was not widely known. [Tr. at 18–20; Dkt. 133.]

Defendants, for their part, emphasize that customers in the industry often share quotes and that BCD's quotes expire after 30 days, making information known about pricing stale and worthless. While a close call, the fact that customers sometimes share a competitor's quotes is not enough to strip the information of trade secret protection entirely, especially since Plaintiffs offered evidence that employees possessed knowledge about pricing that went beyond what's listed within a customer's quote. *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 713 (N.D. Ill. 2009) ("Defendants' argument, that the ability of customers to share the information means it is not confidential, has been explicitly rejected by Illinois courts."). But see *Packaging*, 2015 WL 6164957, at *4 ("[I]nformation shared with customers with no confidentiality restrictions attached to them does not warrant trade secret protection."); *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, at *4 (N.D. Ill. Oct. 25, 2018) ("Pricing information shared freely with customers without confidentiality requirements is insufficiently secret to garner protection.").

That BCD's quotes expire after, at most, 30 days no doubt limits their value as a potential trade secret. See *UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 871 (N.D. Ill. 2009) (explaining that, especially in the rapidly evolving technological world, stale and out-of-date documents lack actual or potential value); *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, 681 (S.D. Ind. 1998) (explaining that "customers, cost, and pricing is among the most fragile and ephemeral types of trade secrets"). But again, Plaintiffs offered credible testimony that the information memorized and shared by Employee-Defendants went beyond the real-time quotes and extended into information about price margins and customer specific pricing information, such as the customer's annual revenue and spending

27

habits—information that, at least at this point in the proceedings, the court finds to possess value in its secrecy.

## Misappropriation/Use of Trade Secrets

Having established that Plaintiffs have a likelihood of success in demonstrating that customer specific data such as preferences and purchasing habits constitute trade secrets, the court must next determine whether they have a likelihood of success in proving that each defendant misappropriated or is likely to misappropriate that information.

*Eugene Kozlovitser.*[19] First, Plaintiffs allege that Kozlovitser "provided examples of BCD configuration services provided to customers and an explanation of BCD's margin information in a presentation to more than 200 Paragon Micro employees." [Dkt. 124-1 at 5.] In support, they cite Kozlovitser's deposition where he explained that he gave a presentation to Paragon employees explaining in "broad strokes" what he did at BCD. [Dkt. 85 at 62.] In the presentation, he offered examples from his time at BCD, although it's not clear exactly what information those examples exposed about BCD's confidential information, if any. [*Id.* at 62–63.]

Plaintiffs assert that Kozlovitser's presentation included examples of BCD's price margins, which would likely constitute trade secrets. Kozlovitser, for his part, expressly rejected that he shared information about BCD's price margins. [*Id.*] BCD, he explained, "kitted" its products and services. [*Id.*] At Paragon, however, the company separated services and products and, Kozlovitser continued, it was service margins, not BCD's margins, that he discussed in the presentation. [*Id.*]

Next, Plaintiffs present evidence that, while employed at Paragon, Kozlovitser told a BCD customer that he had a "rough understanding" of the details of the customer's agreement with BCD as he had a "part of putting it together" when he was at BCD. [Dkt. 85-2 at 157.]

Finally, Plaintiffs stress that, shortly after he left BCD, Kozlovitser deleted "a good amount" of recent BCD emails and wiped his laptop. [Dkt. 65 at 10–12, 31; Tr. at 96.]

The court finds that Plaintiffs have shown some likelihood of success in demonstrating that Kozlovitser misappropriated BCD's trade secrets. Because direct evidence of trade secret misappropriation is rare, plaintiffs often rely on circumstantial evidence to prove their case. Acts such as deleting documents, wiping

---

[19]     While not included in its "Summary of Misappropriation by Individual Defendants," dkt. 124-1, Plaintiffs asserted at times that Kozlovitser misappropriated a trade secret when he shared confidential information regarding the potential sale and purchase price of BCD. But BCD does not explain how that information was used in Paragon's business or led to irreparable harm.

28

computers, and lying about going to work for a competitor may be indicative of misappropriation. See *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *11 (N.D. Ill. Sept. 8, 2017) (finding likelihood of success on trade secret misappropriation claim when defendant wiped company cellphone, failed to return all confidential documents, and told employer he was not going to work for a competitor); *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 926 (Ill. App. Ct. 2005) (finding misappropriation when defendant attempted to destroy evidence that he downloaded company documents).

Here, not only did Kozlovitser wipe his laptop and delete a substantial number of emails from his BCD account, but he also lied about going to work for a competitor and, what's more, he worked for both BCD and Paragon at once. Those deceptive actions, coupled with a presentation referencing his work at BCD, is enough to present a fair question on whether Kozlovitser misappropriated and will inevitably misappropriate BCD trade secrets.

*Darren Giacomini.* Plaintiffs contend that Giacomini has retained contact with key decisionmakers at VSS, Covalent, and Electric Company of Omaha and will inevitably continue to misappropriate his knowledge of those companies' preferences to solicit business for Paragon. [Dkt. 124-1 at 6.] Again, Plaintiffs are unlikely to succeed on their claim that customer identities and contact information are trade secrets. In any event, Defendants offer persuasive evidence—affidavits from each of these customer's representatives—demonstrating that Giacomini brought the customers to BCD and that the customers would have followed Giacomini to Paragon regardless of whether Giacomini reached out to them.

Plaintiffs say that Giacomini is likely to misappropriate information on his personal laptop, which Plaintiffs argue likely includes BCD's trade secrets, including "as-built product information, customer diagrams, and any support-related tools." [Tr. at 139.][20] That Giacomini refuses to submit his laptop for forensic imaging, they continue, is circumstantial evidence that it contains trade secrets he will inevitably misappropriate. [Dkt. 124-1 at 6.][21]

In his deposition, Giacomini explained that BCD required him to use his personal computer for work. [Dkt. 68 at 5.] Since his employment with BCD ended, he now uses that computer strictly for personal purposes. [*Id.* at 6.] While at BCD, he continued, he completed configuration work on the computer. [*Id.*] Giacomini said

---

[20] Plaintiffs ground this assertion in Basgall's testimony that Giacomini likely has this information on his personal laptop, which he used for BCD work. But Basgall also admits that he does not know if anything remains on the laptop or whether any information existed on the laptop in the first place. [Tr. at 175.]

[21] Notably, BCD's confidentiality agreements do not require an employee to subject their personal devices to inspection for confidential information by BCD. [Dkt. 35-1 at 54.] Instead, it advises the employee to return or destroy the information and, upon request by BCD, to supply written certification that the information has been returned or destroyed. [*Id.*]

that Chris Walters, a BCD employee who manages professional services, implemented a policy requiring the configurations to be saved, so Giacomini would usually have the integrator save the configuration on their laptop or on the system and then have the integrator forward the configuration to Walters. [*Id.* at 6–7.] When the integrator was unable to complete that process, Giacomini explained that he would temporarily save the configuration to his own laptop's desktop and then later delete the configuration. [*Id.* at 7.] When asked why he only saved the configurations temporarily, Giacomini said that the configurations are only valid while he's on-site and can change from day to day, so the files are useless once he leaves the work site. [*Id.*] Giacomini stated that he no longer has any BCD information on his laptop. [*Id.* at 10.]

Even if Giacomini has BCD information on his laptop, Plaintiffs have offered no evidence that he has misappropriated or will inevitably misappropriate any of the information. They assert that not having the "as-builts" allegedly located on Giacomini's laptop has hindered their ability to fully service clients. [Tr. at 148–150; Dkt. 124 at 4 (arguing that Giacomini "retaining" and taking confidential information constitutes misappropriation").] But "the failure to return lawfully acquired information does not constitute 'misappropriation' of that information under the DTSA." *Croner*, 419 F. Supp. 3d at 1066.

*Max Burgess.* Plaintiffs presented evidence showing that Max created a "Client Activation Plan," which included detailed information, including annual revenue, product preferences, top partners, and branch buying habits, about one of BCD's customers. [Dkt. 67-1.] They also demonstrated that he shared information about another BCD customer's spending habits, "important characteristics they look for in a partner," and current needs. [Dkt. 84-5 at 15.]

Plaintiffs have demonstrated a likelihood of success in demonstrating that Max misappropriated BCD trade secrets. As explained above, the type of detailed customer information shared by Max constitutes trade secrets. Max used that information, which he learned during his time at BCD to assist Paragon in soliciting these customers. BCD has also raised a fair question about whether Max will inevitably disclose more BCD trade secrets. As evidenced by his Client Activation Plan and his statement about "burn[ing] BCD to the ground," Max is currently targeting customers he served while at BCD. And his actions at Paragon thus far demonstrate that he has access to detailed and valuable customer information (whether in his memory or elsewhere). It would be difficult for him to target BCD customers without relying on that information. See *PepsiCo, Inc.*, 54 F.3d at 1270.

Plaintiffs also argue that Max misappropriated customer contact information and product preferences. [Dkt. 124-1 at 2–4.] The court sees things differently, however. The customer identities and contact information are not trade secrets and the alleged misappropriation of "product preferences" consists of Max sending mass emails to various customers stating that Paragon can provide "Servers, Workstations,

Switches, UPS, Monitors, Laptops, Professional Services, etc. [Dkt. 65-4.] These descriptions are too generic—evidenced by Max's reiteration of the exact same products in each email—and easily ascertainable to qualify as trade secrets.

*Santo Nudo.* Plaintiffs point to no evidence that Nudo misappropriated any trade secrets. They refer the court only to his contact with key decisionmakers, which, for purposes of a preliminary injunction, are unlikely to constitute trade secrets. [Dkt. 124-1 at 6.]

Contrary to Plaintiffs' assertion otherwise, the emails between Nudo and BCD customers do not demonstrate that he misappropriated customer pricing information or preferences. [Dkt. 66-1.] Basgall testified that Nudo had a habit of documenting items he sold while at BCD on an Excel file, and to Basgall's knowledge, Nudo did not surrender that file when asked to turn in his stuff. [Tr. at 143.] The court finds this testimony unconvincing. Basgall does not explain how he knows whether Nudo surrendered the Excel sheet. And Nudo submitted an affidavit representing that he took no customer pricing information with him when he left BCD. [Dkt. 86-6.] Ultimately, Plaintiffs only present evidence that Nudo took a similar position with a competitor, which is not enough to show a likelihood of inevitable disclosure.

*Erik Schmidt.* In support of their claim that Schmidt misappropriated information about BCD's customers, Plaintiffs point to an email Schmidt sent to one of those customers while at Paragon, where he stated, "I'm committed to delivering the same trusted services and products you've relied on me and this team for in the past, but now with an expanded portfolio to address [Requests for Proposals] and project requirements you had to find other sources to procure." [Dkt. 65-4 at 71.] This single, relatively generic email, is not sufficient to demonstrate trade secret misappropriation. Scmidt merely relays that Paragon offers more products and services than BCD, which was no secret, and highlights his ability to continue serving the customer. While he includes a vague reference to the customer's previous purchasing habits, the email alone does not allow a non-speculative inference about what those products and services were and whether that information is difficult to ascertain.

*Tracey Lingle.* Plaintiffs offer no evidence that Lingle misappropriated any trade secrets. They point only to his sharing key decisionmakers, which the court deemed, at this stage, unlikely to constitute trade secrets. [Dkt. 124-1 at 5.][22] Plaintiffs are also unlikely to succeed in demonstrating inevitable misappropriation. While O'Mahoney testified that Lingle kept a "notebook with a lot of configuration

---

[22]    Asserting that Lingle used confidential information about customer preferences, Plaintiffs point to an email exchange Lingle had with the customer once he was at Paragon. But the emails show that the customer provided their preferred specification, not that Lingle already had knowledge of them. [Dkt. 66-2.] That Lingle specifically asked the customer which specifications they wanted, moreover, might be viewed as implying that Lingle does not have knowledge of the customer's preferences.

information," O'Mahoney did not see Lingle take any documents from BCD and did not know whether Lingle kept the notebook. [Tr. at 112.] Without evidence that Lingle kept confidential information or misappropriated trade secrets, demonstrating that Lingle took a similar position at a competitor is not enough to show inevitable disclosure.

### iii.    Breach of Contract

BCD asserts that the Employee-Defendants breached their confidentiality agreements, including Kozlovitser's consulting agreement, with BCD.

The consulting agreement prohibits Kozlovitser from using and disclosing "BCD's trade secrets or other confidential or proprietary information concerning BCD" during and after the term of employment except to the extent necessary to carry out his obligations to BCD. [Dkt. 35-1 at 48.] The confidentiality agreements signed by each Employee-Defendant imposed a duty to protect BCD's confidential information and to use information only for their obligations to BCD. [Dkt. 35-1 at 50.]

The consulting agreement doesn't define confidential information. But the confidentiality agreements describe confidential information as, among other things, "profit and margin information, finances and financial projections, customers, clients, marketing, and current or future business plans and models." [*Id.*] The agreement excepts from protection, as relevant here, any information that "is or becomes a matter of public knowledge through no fault of the [employee]" and information that is "independently developed by" the employee. [*Id.*]

The court reaches the same conclusions here as it did for trade secrets. While "an enforceable restrictive covenant may protect material not properly characterized as a trade secret and thus affords broader protection than trade secret law does," *SKF USA, Inc.*, 636 F. Supp. 2d at 711 (cleaned up), it cannot protect information "generally available to employees, known by persons in the trade, or easily found in telephone directories and industry directories," such as client identities and contact information, *The Agency, Inc.*, 839 N.E.2d at 615; *Hightower Holding, LLC v. Kedir*, 2024 WL 3398361, at *8 (N.D. Ill. July 11, 2024*); SKF USA, Inc.*, 636 F. Supp. 2d at 711 ("In Illinois, confidential information is 'particularized information disclosed to [the employee] during the time the employer-employee relationship existed which [is] unknown to others in the industry and which give[s] the employer advantage over his competitors.'" (quoting *Lifetec, Inc. v. Edwards*, 880 N.E.2d 188, 196 (Ill. App. Ct. 2007)).[23]

---

[23]    BCD, moreover, makes no attempt to distinguish between information constituting a trade secret and information that's confidential but does not rise to the level of a trade secret. [Dkt. 63 at 23 (referencing trade secret argument when discussing confidentiality agreements).]

As the court explained above, BCD has not shown that customer identities and contact information are unknown to others in the industry or are difficult to obtain. BCD has, however, established as much with regard to other customer-specific information, like buying habits and preferences. The court's analysis for trade secret and trade secret misappropriation, then, applies with equal force here.

### 2. Irreparable Harm

Plaintiffs have demonstrated a likelihood of success on their claims for trade secret misappropriation against Kozlovitser, Max, and Paragon and breach of contract claims against Kozlovitser and Max. The court now assesses whether they have shown irreparable harm arising from those claims.

Harm is "irreparable" when "legal remedies are inadequate to cure it." *Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate" does not denote that such remedies would be "wholly ineffectual," only that such a remedy would be "seriously deficient as compared to the harm suffered." *Id.* (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). The court must weigh "how urgent the need for equitable relief really is." *U.S. Army Corps of Engineers*, 667 F.3d at 788; *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) ("But for the grant of a preliminary injunction to be proper, the harm to the plaintiff also must be judged irreparable—meaning not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor.").

Loss of customer relationships, profits, and reputational harm can all constitute irreparable injuries if the losses cannot be identified. *See DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022); *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994); *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012). But see *Bidi Vapor, LLC v. Vaperz LLC*, 543 F. Supp. 3d 619, 632 (N.D. Ill. 2021) ("Lost profits generally do not constitute irreparable injury, barring exceptional circumstances.") (citing *Downstate Stone Co. v. United States*, 651 F.2d 1234, 1241 (7th Cir. 1981)).

Plaintiffs first assert that the lost profits and customers arising from Defendants' misappropriation of trade secrets would be difficult to calculate. But difficult does not mean impossible and the court finds that the parties can calculate Plaintiffs' lost profits with reasonable certainty. Absolute certainty, after all, is not required. See *Croner*, 419 F. Supp. 3d at 1078.

Remember the potential trade secret misappropriation at issue here is mostly limited to difficult-to-ascertain customer information stored in NetSuite, such as preferences and buying habits. BCD, of course, knows which customers it serviced during the time each Employee-Defendant worked at the company. And it should be

able to identify which Employee-Defendants serviced which customers or accessed certain NetSuite information. So Plaintiffs can and have identified specific lost customers, and by extension, lost profits.

BCD also keeps records of customer spending from year to year, and makes projections about future revenue. [Tr. at 7 (Plaintiffs' counsel describing a spreadsheet as "analysis of customers that were lost and some of the revenue associated with those customers"); Tr. at 36–37 (O'Mahoney explaining how BCD uses data to predict revenue expectations).] And Cowen testified at trial that Paragon also keeps detailed records of its customers and revenue. [Tr. at 193–94.] Using those records, the parties should be able to calculate with reasonable certainty any losses, including future losses, stemming from Defendants' misappropriation of BCD's trade secrets. See *Aon PLC v. Alliant Ins. Servs., Inc.*, 2023 WL 3914886, at *11 (N.D. Ill. June 9, 2023) (observing that "damages experts frequently value businesses using accepted methodologies, such as discounted cash flows and applying market multiples, to compare the value of a book of business before and after a significant acquisition, or loss, of a substantial volume of business"); *Creative Fin. Staffing LLC v. Kubacki*, 2023 WL 1818560, at *4 (N.D. Ill. Feb. 8, 2023) ("Even when customers work with competitors simultaneously, metrics for measuring lost sales are available.").[24]

The trade secrets at issue here are also limited in time—both because the information will eventually become stale and because Plaintiffs have not demonstrated that Defendants retained any confidential information beyond what they can store in their memory—making Plaintiffs' ability to estimate future lost profits less uncertain.

Had Plaintiffs demonstrated a likelihood of success on its other alleged trade secrets, such as information about its configuration process, the result might be different. As the Seventh Circuit has observed, irreparable harm is more likely in instances where an employee's misappropriation enables a competitor to enter the market because "[c]ompetition changes probabilities." *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005).

But here the potential misappropriation of trade secrets is not what enabled Paragon to enter the video surveillance systems configuration market. As Reimer testified credibly, Paragon had been looking into providing configuration services for its customers far before any alleged misappropriation by Employee-Defendants. [Tr. at 274–77.] And, as the court explained above, Plaintiffs have not shown that Kozlovitser's guidance in helping Paragon establish its configuration services required him to disclose any BCD trade secrets. Rather, Defendants' potential trade

---

[24]     That customers in this industry frequently receive bids from multiple companies for each project undermines Plaintiffs' position that once a customer is lost, it is extremely difficult to win that customer back.

secret misappropriation consists of a narrow set of information about identifiable customers that the Employee-Defendants serviced during their time at BCD. See *DM Trans, LLC*, 38 F.4th at 619 (distinguishing *Hess* because "probabilities are not at issue because the parties were able to identify the eleven customers which had transferred specific volumes of business from [plaintiff] to [defendant]"); *Creative Fin. Staffing LLC v. Kubacki*, 2023 WL 1818560, at *4 (N.D. Ill. Feb. 8, 2023) (applying *DM*, not *Hess*, because plaintiffs identified discrete customers).

Plaintiffs also assert that after leaving BCD, Employee-Defendants, with knowledge of BCD's confidential information, told customers that BCD was going out of business and would not be able to provide the services and products the customers needed. These rumors, the Plaintiffs explain, have caused them irreparable harm. Plaintiffs' assertions are not supported by the record, however.

First, BCD vehemently denies that any of these claims are true. [Tr. at 57, 151.] If that's correct, it's difficult to understand how Employee-Defendants' disclosure or use of trade secrets could have caused the reputational damage; presumably, if the claims are false, no trade secrets would support them.

Second, the evidence offered to support the assertion is based on O'Mahoney's and Basgall's testimony at the evidentiary hearing. O'Mahoney testified that he did not personally hear any Employee-Defendant talk negatively about BCD but that BCD had "received feedback in that the direction of BCD was not good" and "won't be open much longer." [Tr. at 55–56.] One BCD partner, O'Mahoney stated, had heard BCD was "going under." [Tr. at 56.] Put simply, none of O'Mahoney's testimony speaks to whether any Employee-Defendant's disclosure of trade secrets caused reputational damage beyond lost sales and customers.

Basgall testified that a customer representative told him that either Kozlovitser or Giacomini informed the representative that Giacomini was the only person capable of providing the services the customer needed. [Tr. at 149–50.] Again, this testimony does not tie disclosure or use of trade secrets to any reputational harm, particularly since the customer representative at issue stated in an affidavit that he informed BCD that the customer would allow BCD to bid projects in the future once BCD employed someone with Giacomini's certifications in the IT Network Systems for Surveillance Systems industry. [Dkt. 86-6 at 61.] Basgall also said that he attributes rumors that BCD is going out of business to Defendants, but he does not explain how he knew Defendants were responsible for the rumors or, more importantly, how their trade secret misappropriation contributed to the rumors. [Tr. at 150–51.]

The court finds that a final judgment, whether a damages judgment or a permanent injunction, or both, in Plaintiffs' favor would not be seriously deficient as compared to the loss suffered by Plaintiffs. *Life Spine Inc.*, 8 F.4th at 545.

Because the court finds that Plaintiffs fail to demonstrate irreparable harm, it is unnecessary to proceed to the balancing stage of the preliminary injunction analysis. See *DM Trans, LLC*, 38 F.4th at 618 ("A finding of irreparable harm to the moving party, if the injunction is denied, is 'a threshold requirement for granting a preliminary injunction.'"); *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) ("If the threshold [showings of likelihood and irreparable harm] are met, then the court proceeds to 'a balancing phase.'")

## III.   Conclusion

For these reasons, Plaintiffs' motion for a preliminary injunction is denied. Defendants' motion to dismiss is granted in part, denied in part; both Plaintiffs may proceed on their claims for trade secret misappropriation against each Defendant under the ITSA and DTSA. And BCD may proceed with (1) its claims against Employee-Defendants for their alleged breach of their confidentiality agreements, (2) its breach of fiduciary duty claim against Kozlovitser, (3) its inducement of Kozlovitser's breach of fiduciary duty claim against Paragon, and (4) claims for tortious interference with prospective economic advantage and unfair competition to the extent they are premised on Kozlovitser's breach of fiduciary duties and Paragon's role in inducing that breach. Plaintiffs' remaining claims are dismissed.

Enter: 25-cv-6944
Date:   March 20, 2026

_____
Lindsay C. Jenkins

36